## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| PAULETTE LAWSON and LEE | ) | |
| TRINKLE LAWSON, JR, | ) | |
| *Co-Executors of the Estate of* | ) | |
| *Lee Trinkle Lawson, deceased,* | ) | |
| Plaintiffs, | ) | Civil Action No. 7:19-cv-00484 |
| | ) | |
| v. | ) | By: Michael F. Urbanski |
| | ) | Chief United States District Judge |
| FCA US, LLC, | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

This is a products liability action alleging that a 2016 Dodge Journey automobile with a push button (keyless) ignition mechanism was unreasonably dangerous because it did not automatically shut off when the driver exited the car. Before the court is defendant FCA US, LLC's ("FCA") Motion for Summary Judgment. ECF No. 52. The matter has been fully briefed, and the court heard oral argument on the motion on June 1, 2021.

### I.

On July 17, 2017, Lee Trinkle Lawson tragically died from carbon monoxide poisoning. Returning to his home for the evening, Lawson parked his car in his basement garage, but left the motor running. The vehicle, a 2016 Dodge Journey, was equipped with a push button ignition system activated by a key fob.[1] With the key fob in his pocket, Lawson went upstairs into his home and was later overcome by carbon monoxide while he slept.

---

[1] Traditionally, cars were turned on and off with a rotary mechanical key. In keyless ignition vehicles, the "key" is the electronic code transmitted from a device carried by the driver to the vehicle's starting system. A key fob, technically referred to as a "key code carrying device," is a physical device which is capable of electronically transmitting a key code to the vehicle starting system without physical connection (other than its presence in the vehicle) between the device and the vehicle. FCA termed its keyless ignition system "Keyless Enter-N-Go."

Plaintiffs allege that the vehicle was unreasonably dangerous because it did not automatically turn off the engine some period after Lawson removed the key fob from the car.

FCA moves for summary judgment, arguing that plaintiffs' design defect claim fails for lack of evidence sufficient to establish that the 2016 Dodge Journey was unreasonably dangerous because it did not conform to a government standard, industry norm, or the reasonable expectations of consumers. Plaintiffs agree that the 2016 Dodge Journey was manufactured and sold in compliance with government and industry standards. Plaintiffs also fail to present sufficient evidence from which a reasonable jury could conclude that consumers in 2016 reasonably expected that Lawson's Dodge Journey would automatically shut off after he exited. As such, the court will **GRANT** FCA's motion for summary judgment.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary

will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the Court must determine that no reasonable jury could find for the non[-]moving party on

the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

As a federal court sitting in diversity, the court must apply the substantive law and choice-of-law rules of the forum state. See Salve Regina Coll. v. Russell, 499 U.S. 225, 226 (1991) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). Lawson's death occurred in Virginia, so Virginia products liability law applies. See Fry v. Commonwealth, 231 Va. 370, 376, 345 S.E.2d 267, 272 (1986).

In a products liability case, whether proceeding on an implied warranty or negligence theory of liability, the standard imposed on a manufacturer "is essentially the same." Slone v. General Motors Corp., 249 Va. 520, 526, 457 S.E.2d 51, 54 (1995) (quoting Logan v. Montgomery Ward, 216 Va. 425, 428, 219 S.E.2d 685, 687 (1975)). Under either theory, the plaintiff must show that a product contained a defect that rendered it "unreasonably dangerous for the use to which it would ordinarily be put or for some other reasonably foreseeable purpose and that the unreasonably dangerous condition existed when the [product] left the seller's hands." Sutherlin v. Lowe's Home Centers, LLC, No. 3:14-CV-368, 2014 WL 7345893, at *8 (E.D. Va. Dec. 23, 2014) (citing Logan, 216 Va. at 428, 219 S.E.2d at 687). Manufacturers are not required to produce "accident-proof products," Slone, 249 Va. at 526, 457 S.E.2d at 54, or even "incorporate the best or most highly-advanced safety devices." Alevromagiros v. Hechinger Co., 993 F.2d 417, 420 (4th Cir. 1993) (citing Marshall v. H.K. Ferguson, 623 F.2d 882, 885 (4th Cir. 1980)). Thus, to determine if a product is unreasonably dangerous, a court "will consider safety standards

promulgated by the government or the relevant industry, as well as the reasonable expectations of consumers." Alevromagiros, 993 F.2d at 420. For a plaintiff to prove that an "unreasonably dangerous" defect existed, "[h]e or she must establish the violation of industry or government standards, or prove that consumer expectations have risen above such standards." Id. at 422.

"Government safety standards and industry practices are highly relevant on the question of whether the manufacturer's design was negligent because they permit an inference that the manufacturer exercised (or failed to exercise) ordinary prudence." Evans v. NACCO Materials Handling Grp., Inc., 295 Va. 235, 247, 810 S.E.2d 462, 449 (2018). But compliance with governmental or industry standards alone will not carry the day for FCA. "Government regulations and industry standards and practices are not dispositive, however. It may be the case that such regulations simply do not exist, for example, or if they do, they may have become antiquated. Industry practices likewise are not conclusive in assessing whether a manufacturer was negligent." Id. (citing Sexton v. Bell Helmets, Inc., 926 F.2d 331, 336 (4th Cir. 1991) ("conformity with industry practice is not conclusive of the product's safety, because an industry could adopt a careless standard. . . .")).

## IV.

Both the federal government and the automotive industry have issued safety standards relating to keyless ignition systems. Neither the government nor industry standard requires cars with keyless ignition systems to automatically shut off after a period of time once the key fob leaves the car.

### A.

The applicable government safety standard is Federal Motor Vehicle Safety Standard ("FMVSS") 114, entitled "Theft protection and rollaway protection." FMVSS 114 does not require vehicles with keyless ignition systems to automatically shut off when the key is removed from the vehicle. 49 C.F.R. § 571.114

In a Notice of Proposed Rulemaking issued on December 12, 2011, the National Highway Traffic Safety Administration (NHTSA) proposed a rule requiring that an audible warning be given to any driver who exits a vehicle without first turning off the engine. Federal Motor Vehicle Safety Standards: Theft Protection and Rollaway Protection, 76 Fed. Reg. 77,183 (Dec. 12, 2011), ECF No. 53-36. In its Notice of Proposed Rulemaking, NHTSA declined to propose a rule requiring an automatic shutoff, opting instead to propose an audible warning when a driver exits a vehicle without first turning off the propulsion system. On the issue of an automatic shutoff, the notice of proposed rulemaking stated:

> [W]e considered requiring the engine to shut down after a specified period of time, however, there are many situations in which a driver intends to leave some electrical system or the engine in the vehicle running without his or her presence. An example is leaving a passenger with heat or air conditioning on while the driver runs an errand, or keeping the engine running to prevent the inability to restart the engine in a very cold climate. After reviewing many possible scenarios and careful consideration, we decided we could not propose a time that would cover all possible reasons consumers would want to leave the propulsion system running in their absence from the vehicle.

Id. at 77,193. In making this judgment, NHTSA expressly considered the risk of carbon monoxide poisoning. "When examining possible countermeasures for the situation in which a driver walks away from a vehicle with its propulsion system active, thereby increasing the

risk of theft or carbon monoxide poisoning, NHTSA considered a requirement for an automatic shut-off feature applied to vehicles fitted with electronic key code systems." Id. at 77,194. After noting that "some manufacturers already provide this feature on their passenger motor vehicles," the proposed rulemaking stated:

> NHTSA is not proposing text to require these automatic shut off systems. We have been unable to conclude that there is a specified period of time after which the propulsion system should be shut down to effectively address various scenarios mentioned in VOQs [Vehicle Owner's Questionnaire] submitted to the agency.
>
> \*          \*          \*
>
> We believe that the new alert that we are proposing would refocus the driver's attention on the vehicle when s/he is leaving if s/he has inadvertently left the propulsion system active. For these reasons, we tentatively conclude that we do not need to regulate vehicle propulsion automatic shut off systems at this time, however, we request comment on this issue.

Id. at 77,194-95.

This Notice of Proposed Rulemaking was not followed by final agency action, and FMVSS 114 was not amended as a result. Thus, even now, FMVSS 114 does not require an external audible warning or that the engine automatically shut off when a driver takes the key fob out of a running vehicle.

**B.**

Nor have plaintiffs identified any published industry standard requiring automatic engine shutoff.  Society of Automotive Engineers (SAE) Surface Vehicle Recommended Practice for Keyless Ignition Control Design (SAE J2948), issued in January 2011, recognizes that "user instigated errors may include . . .  exiting the vehicle while the vehicle propulsion system is enabled." SAE J2948, ECF No. 71-19. To address this perceived user

instigated error, SAE International recommended that "[a]n externally audible or visual alert shall be activated when the starting system is in ACCESSORY, ELECTRICAL, or RUN MODE, all doors become closed, and an electronic key code carrying device (e.g., keyfob) is not present in the vehicle." Id. at 6. The evidence in this case also includes a study sponsored by SAE International, authored by Jeya Padmanaban, and entitled "Frequency of Accidental CO Deaths Due to Vehicle Exhaust in Enclosed Areas." ECF No. 53-20. This study, published on April 14, 2015, concluded that the rate of carbon monoxide poisoning deaths from vehicle exhaust in the United States "is not increasing with the introduction of smart key vehicles. Results show that drivers can inadvertently leave the engine running in either rotary or smart key vehicles." Id. at 1.

The 2016 Dodge Journey had neither an automatic shutoff nor an external audible alert. Rather, it had an internal cue notifying the driver that the engine remained on.  Despite the lack of an external audible alert recommended by SAE J2948, plaintiffs do not contend that the 2016 Dodge Journey was defective because it did not have an external audible alert. Hannemann Dep., ECF No. 53-7, at 10 ("Q. So in this case, you are not proposing any warnings that are required in addition to the automatic shut off, correct? A. Correct."). Rather, their case rests exclusively on FCA's decision not to provide an automatic shutoff feature.

## V.

In the absence of a government or industry standard requiring an automatic shutoff feature in vehicles with a push button ignition, plaintiffs hinge their case on the opinion of Neil Hannemann, an engineer and former automobile industry executive, who testified that

the 2016 Dodge Journey was unreasonably dangerous without an automatic shutoff feature. Hannemann concluded that the automatic shutoff feature, technically and economically feasible in 2016, "is a safer alternative design."  Hannemann Report, ECF No. 53-6, at 34. Hannemann stated that FCA was aware that "its Keyless Enter-N-Go system was resulting in users unintentionally leaving their vehicles running. . . . However, FCA ignored the risk to the life and safety of its customer, such as Mr. Lawson, and failed to implement an automatic engine shut off feature." Id. On the issue of reasonable consumer expectations, Hannemann's report concluded:

> A consumer does not expect that a vehicle equipped with a mechanical key will run continuously if they exit the vehicle with the key. Many consumers would not expect that their smart key vehicle would run continuously if they exit the vehicle with the key fob. Customers of FCA vehicles with Keyless Enter-N-Go have had no explanation or education that their key fob is not the actual key, they have an expectation that the key fob is the key.

Id.

Plaintiffs contend that Hannemann's expert opinion alone is sufficient to withstand FCA's motion for summary judgment, arguing that there is an intermediate step — termed the "expert safety step" — that allows them to get to the jury in this case based solely on the opinion of their automotive engineering expert. For this proposition, plaintiffs rely on the opinion of the Eastern District of Virginia in Benedict v. Hankook Tire Co., Ltd., 295 F. Supp. 3d 632 (E.D. Va. 2018).

In Benedict, the plaintiff was hurt when the cement mixer he was driving veered off the road and rolled over. Benedict alleged that the cause of his injuries was tread separation of a truck tire manufactured by Hankook. While it was undisputed that the tire at issue in

Benedict met the government safety standard, FMVSS 119, no formal industry standard was identified. The Benedict court noted that the absence of a formal industry standard "does not end the analysis but rather triggers an 'in-between' step (the 'expert safety' step) before consumer expectations are assessed." 295 F. Supp. 3d at 638.

> This "expert safety" step authorizes courts to rely on expert testimony to determine whether a product is unreasonably dangerous when there is no "established norm in the industry," and that assessment is made without evaluating what reasonable consumers expect.
>
>     *          *          *
>
> [W]here there is no officially promulgated industry guidance as to a product, courts move to the expert safety step and resort to expert testimony to determine if that product contains an unreasonably dangerous defect. This analysis is distinct from the consumer expectations measure of unreasonable danger, and expert testimony is sufficient at this stage if it explains, with analytical rigor, why the product is unreasonably dangerous. An opinion is analytically rigorous if it is based on, for instance, relevant literature, testing and inspection of the product, and substantial industry experience and expertise.

Id. at 638, 649.

Plaintiff's reliance on Benedict is misplaced. While there was no formally promulgated industry standard identified in Benedict, there is one in this case. That standard, SAE J2948, only recommends an audible or visual alert when the car is running and the key fob is removed and does not go so far as to require an automatic shutoff of the engine. Thus, even under the Benedict rubric, the "expert safety step" is not implicated here.

Noting that there is no industry standard requiring an automatic shutoff, FCA casts aside Hanemann's expert opinion, arguing that it is not objective, but rather reflects his subjective belief that a safer design would have included an automatic shutoff feature. FCA argues that the question of whether a product is unreasonably dangerous is an objective one,

and that applying an objective test, plaintiffs cannot prove that the 2016 Dodge Journey was unreasonably dangerous.

FCA is correct that the law requires an objective assessment. "To sustain a claim for negligent design, a plaintiff must show that the manufacturer failed to meet objective safety standards prevailing at the time the product was made." Holiday Motor Corp. v. Walters, 292 Va. 461, 478 n.14, 790 S.E.2d 447, 455 n.14 (2016). "Whether a manufacturer was negligent involves an objective inquiry. 'The test for negligence is always objective.'" Evans v. NACCO Materials, 295 Va. at 247, 810 S.E.2d at 470 (quoting Virginia Elec. & Power Co. v. Dungee, 258 Va. 235, 252, 520 S.E.2d 164, 174 (1999)).

In FCA's view, Hannemann's opinion falls short because it does not ask the jury to objectively measure the 2016 Dodge Journey against an existing safety standard, but rather invites the jury to impose Hanneman's subjective view of automotive safety. Rather than help the jury understand and apply an existing standard, FCA argues that Hannemann's testimony "would invite the jury to adopt a *new* standard in 2021 and impose liability on FCA for failing to meet that standard in 2016." FCA Motion to Exclude Hannemann Expert Opinion ("Hannemann Mot."), ECF No. 59, at 5-6. In that regard, FCA cautions the court to be wary of an expert who is "nothing more than an advocate of policy before the jury," In re Air Crash Disaster at New Orleans, 795 F.2d 1230, 1233 (5th Cir. 1986), and suggests that Hannemann's advocacy is apparent from the "cut-and-paste nature of his expert report" and his "generic and vague criticisms as an advocate for the plaintiffs in this case and other cases." Hannemann Mot., ECF No. 59, at 6. FCA asserts that "[a]llowing Hannemann to advocate for a new standard from the witness stand would distract from the dispositive

issues, confuse the jurors, and mislead them into thinking they can hold FCA liable for lacking a feature that Hannemann thinks vehicles should have." Id. at 8-9.

FCA also argues that Hannemann "never defines the relevant standard," but rather asserts that vehicles with key fobs are defective if there is no automatic shutoff.  Avoiding the issue that prevented NHTSA from being able to include an automatic shutoff in its 2011 Notice of Proposed Rulemaking, Hannemann testified that "[t]he exact time to shut off is not that important for this function. It can be anywhere from 15 minutes to 2 hours, and the vehicle will still fit within what I consider safe guidelines." Dep. of Neil E. Hannemann, ECF No. 53-7, at 20.  Because Hannemann does what NHTSA would not do – require an automatic shutoff of indeterminate length – FCA argues that "Hannemann's proffered standard shifts in the wind because it is not grounded in science, an industry norm, or anything else. He is making it up as he goes along. The Journey is defective because he says so." Hannemann Mot., ECF No. 59, at 10.

Plaintiffs counter that Hannemann grounds his opinion on well accepted principles of safety engineering design. "Mr. Hannemann applied this well accepted methodology, as well as sound engineering judgment based on his years of automotive design experience, to the facts of this case in reaching his conclusions that the subject vehicle's keyless ignition system should have had an automatic shutoff and that such a design was safer overall than one without an automatic shutoff."  Plaintiff's Opp'n Br., ECF No. 81, at 4-5.

The court agrees with FCA that Hannemann's opinion alone is insufficient to withstand its motion for summary judgment.  On balance, Hannemann's subjective view, in and of itself, does not satisfy the objective test necessary to find a product unreasonably

dangerous. As such, the court must decide the question whether there is evidence that reasonable consumer expectations have risen above the government and industry standards. Alevromagiros, 993 F.2d at 422.

## VI.

Reasonable consumer expectations "may be shown by direct evidence of what reasonable consumers considered defective as well as published literature or industry practices recognizing a safety standard that reasonable consumers expected." Evans, 295 Va. at 247, 810 S.E. 2d at 470; see also Alevromagiros, 993 F.2d at 420. "Published literature may include, among other sources, marketing, advertising, presentation, promotional materials, product manuals, and instruction booklets." Evans, 295 Va. at 247, 810 S.E.2d at 470. Such evidence can include "actual industry practices, knowledge at the time of other injuries, knowledge of dangers, the existence of published literature, and from direct evidence of what reasonable purchasers considered defective at the time." Hambrick ex rel. Hambrick v. Ken-Bar Mfg. Co., 422 F. Supp. 2d 627, 634 (W.D. Va. 2002) (citing Sexton v. Bell Helmets, 926 F.2d at 337). As the Fourth Circuit outlined in Redman v. John D. Brush and Co., 111 F.3d 1174, 1181 (4th Cir. 1997),

> Consumer expectations are used to gauge whether a product design is defective because those expectations reveal how society "balances known risks and dangers [inherent in product design] against the feasibility and practicability of applying any given technology" to enhance product safety. Sexton, 926 F.2d at 337. Requiring manufacturers to meet reasonable consumer expectations ensures that their products are required to meet minimum standards deemed appropriate by society, even when those societal standards demand safer products than government or industry standards. Id. at 336-37. In Virginia, a plaintiff can establish reasonable consumer expectations through "'evidence of actual industry practices, . . .

> published literature, and from direct evidence of what reasonable purchasers considered defective.'" <u>Alevromagiros</u>, 993 F.2d at 420-21 (quoting <u>Sexton</u>). These types of evidence are probative when they establish what society demands or expects from a product. <u>Sexton</u>, 926 F.2d at 337.

<u>Redman</u>, 111 F.3d at 1181.

The court is required to assess consumer expectations at the time the 2016 Dodge Journey left FCA's hands. On the issue of consumer expectations, "wholly subjective expectations are insufficient to establish the degree of protection reasonable consumers expect from a product." <u>Evans v. NAACO Materials</u>, 295 Va. at 248, 810 S.E. 2d at 470. Moreover, "[e]ven where a plaintiff can prove that reasonable consumers expected a safer design, we hold that a design is not objectively unreasonable unless the plaintiff can show that an alternative design is safer overall than the design used by the manufacturer." 249 Va. at 249, 810 S.E.2d at 471.

## A.

On the issue of reasonable consumer expectations, plaintiffs offer the following evidence. First, in his report, plaintiffs' expert engineer Hannemann testified that Ford and General Motors began to employ an automatic shutoff feature in 2013.[2] In deposition, however, support for Hannemann's opinion as to the timing of the Ford and General Motors adoption of an automatic shutoff proved elusive. For example, Hannemann did not know what percentage of vehicles for the 2016 model year had an automatic shutoff feature.

---

[2] Hannemann's report states: "Ford designed and implemented a feature that does exactly this, called Automatic Engine Idle Shutoff (AEIS). This was implemented beginning in the 2013 model year on certain Ford vehicles and has been utilized on many if not all Ford smart key equipped vehicle since the 2015 model year." Hannemann Report, ECF No. 53-6, at 15. "General Motors used an automatic shutoff feature starting with the 2013 model year. This feature was then 'rolled out' to all General Motors, smart key equipped vehicles and since the rollout has been completed it is utilized on every General Motors smart key equipped vehicle." <u>Id.</u> at 16.

Hannemann Dep., ECF No. 53-7, at 58-59. Further, when asked at deposition to provide specific examples, Hannemann cited his review of owner's manuals from a 2019 Chevrolet Equinox, a 2018 Chevrolet Malibu, a 2018 Ford Fusion, and a 2016 Ford Taurus. Hannemann Dep., ECF No. 53-7, at 14-16.[3] With the exception of the 2016 Ford Taurus, each of these owner's manuals were for model years after Lawson's 2016 Dodge Journey was manufactured and sold. Hannemann conceded that Mercedes, Audi, BMW, Volvo, and Volkswagen did not have an automatic shutoff feature. Id. at 77-78. Hannemann's testimony falls far short of establishing an industry norm as to the use of an automatic shutoff feature as of 2016. In and of itself, this anecdotal testimony is insufficient to support a finding by a jury that the 2016 Dodge Journey was unreasonably dangerous because if failed to meet reasonable consumer expectations.

Second, FCA was aware of customer complaints that keyless ignition cars remain running when the key fob is removed. Certain of FCA's internal documents demonstrate the awareness of these complaints. These FCA documents include:

- FCA email dated 9/18/2010 summarizing a conference call with NHTSA regarding FMVSS 114. The email stated that "NHTSA stated that the top three customer keyless ignition complaints were: . . . In park, but leaving the engine running – carbon monoxide concern. Is there any warning or feature to prevent this?" ECF No. 69, Ex. 3.

- FCA email dated 7/28/2011. "We have known conditions on W vehicles equipped with Keyless Go of customers inadvertently leaving the vehicle running and getting out of the vehicle and walking away." ECF No. 69, Ex. 4.

- FCA Meeting Notice dated 11/07/2011. "VIT has recently been discussing several modifications to the Keyless Go warning strategy to address some customer concerns." ECF No. 69, Ex. 6.

---

[3] Hannemann claimed that he was aware of additional information on Ford vehicles, but could not testify as it because it would violate a protective order in another case. Hannemann Dep., ECF No. 53-7, at 17.

- FCA Keyless Go Warning Strategy Modification memo dated 11/10/2011. "Scenario 1: Driver can accidentally leave vehicle running if distracted. Many owners report inadvertently doing this on vehicles equipped with Keyless Go."  ECF No. 69, Ex. 7.

- FCA email dated 12/1/2011. "Currently we are working on some enhancements to the Passive Entry/Keyless Go Feature. With this feature, it is possible to exit the vehicle and take the keys with you and leave it running. We have field cases where this has been done accidentally by drivers. There is interest from the WK vehicle line in adding behavior to automatically turn off the engine if the vehicle idles for extended periods of time with no Key detected in the interior. Some potential safety concerns have been raised with this strategy that I would like to discuss with you." ECF No. 69, Ex. 8.

- FCA Customer Assistance Inquiry Record (CAIR) data indicates that around thirty customers contacted FCA between 2010 and 2015 about a vehicle not shutting off when the key fob was removed. CAIR Data, ECF No. 93-13. A few of these customers indicated that their cars had been parked in an enclosed garage and expressed concern regarding carbon monoxide poisoning. FCA responds that these several handfuls of customer contacts are not indicative of reasonable consumer expectations as FCA sold 15 million vehicles during this period.

This evidence establishes that FCA was aware of the issues raised in the 2011 NHTSA Notice of Proposed Rulemaking and studied the issue internally. That FCA's internal documents reflect some interest in an automatic shutoff feature is insufficient to create a jury issue on reasonable consumer expectations because it ignores the countervailing safety considerations reflected in NHTSA's Notice of Proposed Rulemaking and FCA's internal deliberations about the need to keep the engine running in certain circumstances, including while running errands and in extreme weather.

Indeed, FCA did not ignore the issue raised by NHTSA. Rather, in 2013, FCA undertook an engineering study of this issue. This project, termed Design for Six Sigma 2169 (DFSS # 2169), comprehensively addressed the subject of a vehicle left running inadvertently. The goal of the project was to find a solution for customers who accidentally

left their vehicle running while using a keyless ignition system. In making its recommendations, the DFSS # 2169 project team solicited the views of both FCA employees and consumers.

A July 26, 2013, DFSS # 2169 presentation recounts the response to an internal email sent to employees at the Chrysler Technology Center in Auburn Hills, Michigan, which asked "Have you ever inadvertently left your vehicle running?" ECF No. 69, Ex. 10, at 15.[4] The presentation noted that "[p]eople were very passionate and anxious to tell me about their occurrence of this issue." Id. Three of the verbatim responses noted in the report were: "This happened to me when I was travelling to Belvidere for work. It kind of unnerved me because I thought what if I did that in my garage?;" "I actually did this about 2 weeks ago. I have a 2012 Journey SXT and it ran all day in our parking garage, I was shocked we don't have a shut-off feature installed;" "I thought how stupid, how can anyone forget to shut their vehicle off. It happened to my wife and I while the vehicles were parked in the garage. We took the buttons off and now use the keys. . . very scary." Id. at 16. FCA continued to study the issue.

Later that year, on October 11, 2013, the DFSS #2169 project team issued a report entitled "Vehicle Left Running Advertently." ECF No. 69, Ex. 12. Among many other things, this report summarized consumer survey data indicating that 44 percent of Chrysler owners and 39 percent of iCommunity (an on-line Consumer research site) rated among the top three push button attributes that the "Vehicle automatically shuts off after a period of time if I've unintentionally left it running." Of note, however, three other attributes scored

---

[4] This email was sent to roughly 12,800 email addresses. Decl. of James J. Bielenda, ECF No. 53-27, at ¶ 5.

higher: "Vehicle provides a clear indication that the vehicle is still running/engine is on, while I am exiting the vehicle," (52% Chrysler/54% iCommunity); "My vehicle gives me confidence that it is off when I think I've turned it off, even when I am distracted or in a hurry," (46% Chrysler/45% iCommunity); "Vehicle provides a clear indication that the engine is not running/off, each time I turn off my vehicle," (46% Chrysler/43% iCommunity). This data shows that while some consumers wanted their vehicles to automatically shut off after a period of time if it was left running inadvertently, more were interested in knowing that the vehicle clearly indicated whether the car remained running when the key fob was removed. In considering this data, it is significant to note that whether the 2016 Dodge Journey was unreasonably dangerous because it did not provide Lawson with a sufficient warning that his engine remained running after he removed the key fob is not an issue raised in this case.

While the FCS DFSS # 2169 October 11, 2013, report noted that a few competitors used exterior audible alarms to alert the driver that the car was still running when the key fob was removed, the report does not reflect that any manufacturers had implemented an automatic shutoff feature at that time. FCA's Rodner testified consistently that "[a]s part of my DFSS, I did some competitive benchmarking of the vehicles that I had access to, and I – I did not find any that had auto shutoff as part of my DFSS project." Rodner Dep. at 50.

For its part, FCA's engineers recognized that implementing an automatic shutoff was in direct conflict with what the driver had requested and took control away from the driver. As FCS's James Bielenda testified, "there are . . . a lot of conditions that can occur daily in many areas and in many cars where the consumer wants the car to continue to run." Dep. of

James Bielenda, ECF No. 71-2, at 106. For example, a driver may want to exit a car yet keep the engine running for brief errands or in temperature extremes. As FCA's Bielenda testified, when eliminating a hazard through design, compromises have to be made.

> As soon as you start putting in things to turn off things or do that, you're taking away what the individual potentially wants that vehicle to do. So you're - - you're running on a slippery slope there. I mean, if you look at everyday-to-day occurrences and all of that, people shut their car off and – you know, or they leave it running. And it's a real world thing.
>
> I mean, there is many more instances of people wanting their car to run than people inadvertently forgetting to shut the car off.
>
> So you're – you're in control of your car. I cannot guess what you're going to want to do. You make the decision to start the car. You make the decision to shut off the car. If I do anything to stop the car, then there's – the percentage of time that I'm going to be wrong is going to be larger shutting the car off than leaving the car running. People want the car to run for a multitude of reasons versus a very low percentage of people that inadvertently don't shut a car off.

Bielenda Dep. at 148-49.  When asked what FCA determined to be an appropriate amount of time to allow a vehicle to remain on with the key fob absent, Bielenda answered:

> And that's the problem. It's not just FCA. It's the whole industry. It's NHTSA. It's SAE. It's everybody. Nobody knows that the proper amount of time is, because the individual circumstances of why are you doing this lends itself to what – the time that you're going to be doing it. So we can't – you know, this goes back to what I'm saying, you cannot – I cannot make the decision for the driver. The driver has to make the decision, because I don't know what the driver's doing. What is his purpose, his intended use of the vehicle?

Id. at 156-57. As FCA's Bielenda testified, FCA's DFSS # 2169 project team made three recommendations: a visual cue, an interior audible alert, and automatic shutdown. Id. at 162-

64. FCA adopted the first recommendation, which was approved by a consensus of FCA's Level One management.[5] At the end of the day, Bielenda testified that "we're not comfortable taking driver's control away from the car. There's too many incidences that are normal situations where a person wants the car to run for me to make that decision. We just don't feel comfortable doing that." Id. at 175.

FCA's Lori Rodner, Project Leader for DFSS # 2169, testified consistently:

> Q.     Why was the automatic shutoff not implemented?
>
> A.     There – the automatic shutoff feature was a feature that would have purported – you know, proposed to know what the customer wants to do, to be able to think for the customer. In the end it was deemed that there were other concerns or other areas that could pose an issue if the vehicle shut off, if we decided to shut the vehicle off when the customer didn't intend for it to go off.
>
> Q.     What were those scenarios?
>
> A.     I believe I mentioned some of those. Some of them were leaving a pet in the car. Some people – although, really, they shouldn't. They leave, you know, young kids strapped in seats in the car. Some people, you know, could have other scenarios where you get stuck on the side of, you know, a highway. One person goes maybe to get help, and they leave their family in the car in, you know, cold weather. So there were multiple, I think, scenarios that could happen. And we just didn't feel comfortable shutting the vehicle off when the customer and the driver didn't command it to.

Dep. of Lori Rodner, ECF No. 71-13, at 43-44.

At the end of the day, FCA decided, just as NHTSA had done, that it could not determine when a car should automatically shut off because of the various reasons drivers

---

[5] At FCA, Level One management was the first level of management below the Chief Executive Officer. Bielenda Dep., at 166.

choose to leave their cars running, and did not implement an automatic shutoff.  For his part, plaintiffs' expert Hannemann dismisses the driver control rationale for not implementing an automatic shutoff, noting that existing Ford technology allows for both by allowing a driver to temporarily disable the automatic shutoff feature. Hannemann Report, ECF No. 53-6, at 16.

Significantly, the evidence in this case contains independent consumer research that consumers did not expect their keyless ignition vehicles to shut off automatically. A 2015 study authored by Michael Wogalter and Jesseca Taylor, psychology professors at North Carolina State University, entitled "Incorrect Beliefs about Start/Stop Ignition Systems in Automotive Vehicles," indicated that 63 percent of survey respondents expected a car to continue running when the driver parked it in a garage, removed the key fob, and the engine inadvertently remained running. ECF No. 53-30, at 4. While the study concluded that "many people have incorrect or incomplete knowledge about how these systems work," id. at 1, the study runs contrary to the notion that consumers reasonably expected that their cars would automatically shut off when the key fob was removed. In contrast to the 63 percent of the respondents who expected the car to remain running, only 20 percent of the survey respondents indicated that the engine would shut off when the key fob was taken out of range. Id. at 4.

The allegations in this case challenge whether the engineering judgment made by FCA not to include an automatic shutoff rendered Lawson's 2016 Dodge Journey unreasonably dangerous. The evidence in this case is insufficient to permit a reasonable jury to find by a preponderance of the evidence that consumers in 2016 reasonably expected that

cars with keyless ignition systems would automatically shut off. That NHTSA, SAE, and FCA were aware of and studied the issue does not create a genuine issue of material fact that consumers in 2016 reasonably expected that auto manufacturers would exceed government and industry safety standards and include an automatic shutoff feature.

**B.**

Plaintiffs also fail to present an alternative design that is safer overall. In Evans v. NACCO Materials, the Virginia Supreme Court held that event where a plaintiff proves that consumers reasonably expected a safer design, "a design is not objectively unreasonably unless the plaintiff can show that an alternative design is safer overall than the design used by the manufacturer." 249 Va. at 249, 810 S.E.2d at 471. Plaintiffs' alternative design, proposed by automotive expert Hannemann, fails to meet this standard.

Hannemann's proposed alternative design fails to address the concerns, safety and otherwise, raised by NHTSA with requiring an automatic shutoff, as reflected in its 2011 Notice of Proposed Rulemaking. After studying the issue, and expressly considering the risk of carbon monoxide exposure, NHTSA declined to propose a rule requiring keyless entry vehicles to automatically shut off because of the "many situations in which a driver intends to leave some electrical system running without his or her presence." 76 Fed. Reg. at 77,193. Rather than address the timing issue raised by NHTSA, Hannemann suggests that a manufacturer can set its car to automatically shut off "anywhere from 15 minutes to 2 hours." Hannemann Dep., ECF No. 53-7 at 20. In such fashion, Hannemann skirts the dilemma facing NHTSA and does not propose an overall safer design. Rather, he leaves the issue to the manufacturer to sort out. In so doing, Hannemann's design does not address the

countervailing safety considerations cited by NHTSA, such as shutting off a vehicle intentionally left on by a driver running an errand or facing extreme weather conditions. At most, Hannemann's report notes features in certain unspecified Ford vehicles that allow the driver to override the automatic shutoff or warn the occupants that the engine is about to shut off and give the driver an opportunity to extend the idle time. Hannemann Report, ECF No. 53-6, at 16. While Hannemann notes these features of certain Ford models, there is no evidence that these features were an industry norm in 2016 or that consumers reasonably expected that their cars would employ them.

By not considering the tradeoff in safety due to the loss of operator control accompanying an automatic shutoff feature noted by NHTSA, Hannemann does not, and cannot, opine that a vehicle with an automatic shutoff is overall safer as required by Evans v. NACCO Materials. As such, plaintiffs fail to create a jury issue that the 2016 Dodge Journey was unreasonably dangerous when it was manufactured and sold.

In granting summary judgment, the court believes this ruling to be consistent with recent decisions by the Virginia Supreme Court in products liability design defect case. In each of these cases, the Supreme Court set aside jury verdicts for the plaintiff, determining that they were unsupported as a matter of law. In Holiday Motor Corp., the Virginia Supreme Court reversed a jury verdict for plaintiff in a case against Mazda for failing to design convertible soft tops to provide occupant rollover protection. In its decision, the Virginia Supreme Court took note that the NHTSA roof crush resistance standard excluded convertibles. Nevertheless, plaintiff's expert engineer, as Hannemann does here, testified from a general engineering principle that the Mazda Miata was unreasonably dangerous

because its soft top was not designed to provide rollover protection. The Virginia Supreme Court disagreed:

> In essence, Walters' assertion, unsupported by industry standards or custom, that the soft top should stay latched to the windshield header in all foreseeable rollovers seeks to impose upon manufacturers the duty to design a rollover-proof convertible when a soft top is in use. Yet, it is well-settled that "[t]he manufacturer is not an insurer and is not required to design and market an accident-proof product. In short, we believe that imposing a duty upon manufacturers of convertible soft tops to provide occupant rollover protection defies both "common sense" and "good policy."

292 Va. at 481-82, 790 S.E.2d at 457 (citing Turner v. Manning, Maxwell & Moore, Inc., 216 Va 245, 251, 217 S.E.2d 863, 868 (1975); Dorman v. State Indus., Inc., 292 Va. 111, 123, 787 S.E.2d 132, 139 (2016); Jeld-Wen, Inc. v. Gamble, 256 Va. 144, 149, 501 S.E.2d 393, 397 (1998)).

Likewise, in Evans v. NACCO Materials, the Virginia Supreme Court held that the plaintiff failed to prove that the parking brake on a clamp lift truck was unreasonably dangerous because it allowed for the operator to adjust it. The court found that plaintiff presented no evidence on the reasonable expectations of a user or consumer of the product with respect to the operator adjustability of the parking brake and further failed to prove that the design she proposed was safer overall. 249 Va. at 248-51, 810 S.E.2d at 470-72.

Consistent with the Virginia Supreme Court's recent decisions in Walters and Evans, the evidence in this case is insufficient to establish that consumers reasonably expected that the 2016 Dodge Journey would automatically shut off some time after the key fob was removed. As such, there is no genuine issue of material fact that the 2016 Dodge Journey was unreasonably dangerous when manufactured and sold.

## VII.

For these reasons, the court is required to **GRANT** FCA's motion for summary judgment on plaintiffs' claim that the absence of an automatic shutoff rendered the 2016 Dodge Journey unreasonably dangerous.

An appropriate Order will be entered this day.

Entered: August 23, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.08.23 09:46:33
-04'00'

Michael F. Urbanski
Chief United States District Judge